Bulat *v.* Londrigan.

MARCO BULAT and EDWIN A. STEVENS

*v.*

PATRICK and ELIZA LONDRIGAN.

[Submitted December 18th, 1901. Decided January 9th, 1902.
Filed April 23d, 1902.]

1. An affidavit filed by the attorney of a judgment creditor on filing the transcript of a judgment of the district court for over $200 in the common pleas court, which states that the whole amount of such judgment and costs remain due and unpaid, is equivalent to stating that over $10 is due on the judgment, as required to be stated in such affidavit by *Gen. Stat.* p. 1228.

2. The affidavit in such case failed to state that defendant was not possessed of goods and chattels sufficient to pay the judgment, as required by *Gen. Stat. p. 1228*, but an execution had been issued and returned *nulla bona* in the district court, and there was no contention or evidence in a suit to quiet title to real estate sold under an execution of the common pleas that defendant had sufficient personal property to satisfy the judgment. It was generally supposed by the bar at the time of the filing of the affidavit that *Gen. Stat. p. 1228* had been repealed by *Gen. Stat. p. 1260* §§ *4, 5.* There was nothing to show an intent to disregard the statute, or any injury to defendant.—*Held*, that the defect in plaintiff's title arising from the defect in the affidavit was insufficient as a defence to plaintiff's action to quiet his title.

3. The return of the district court execution *nulla bona* and the seizure of the lands under the common pleas execution is *prima facie* proof that defendant had no personal property subject to execution.

4. Defendant was the owner of real estate, which was sold to a judgment creditor, under execution, for a fair valuation, though the evidence as to the value was conflicting. Defendant was embarrassed financially, and disposed of several pieces of property to creditors by execution sale and otherwise, and the judgment creditor who purchased the property in question released the entire judgment at the request of defendant at a time subsequent to the sale, though the property was sold for less than the face of the judgment. There was other evidence tending to show that the creditor was to take the property for the judgment. There was also evidence that defendant, after the sale, notified the tenants in possession of the property to pay the rent to the judgment creditor, and told plaintiff, who subsequently purchased the property of the judgment creditor, that the latter owned the property, and plaintiff should purchase from him; but such facts were denied by defendant. The plaintiff erected valuable improvements, paid mortgages, taxes, &c., on the property for a number of

years after acquiring the same, with the knowledge of the defendants.—
*Held,* sufficient, in a suit by plaintiff to quiet title, to estop defendants
from relying on a defect in the affidavit of the attorney of the judgment
creditor, required by *Gen. Stat. p. 1228,* in filing the transcript of the judg-
ment, which was originally obtained in the district court, in the common
pleas court.

5. The request by defendant of the judgment creditor, after the execu-
tion sale, that the latter should release the balance due on the judgment,
operated as an affirmance of the sale by defendant.

6. The plaintiff, having acquired the property from the judgment cred-
itor by a conveyance containing a covenant of warranty, was entitled to
set up such affirmance as an estoppel, though it occurred after plaintiff
acquired the property, as the right to set up the estoppel passed at once,
under the covenants of the deed, to the plaintiff.

7. The fact that defendant, through mistake of law, did not know that
there was a defect in the affidavit, did not prevent defendant's conduct
from operating as an estoppel, as he had knowledge of the suit, and was
bound to inquire whether the proceedings were according to law, if he in-
tended to take advantage of any defect therein.

On final hearing on bill, answer and proofs taken in open
court.

*Mr. Samuel A. Besson* and *Mr. James B. Vredenburgh,* for the
complainants.

*Mr. Horace L. Allen,* for the defendants.

Pitney, V. C.

The complainant Bulat is in possession under color of title,
and claims to be the owner of a parcel of real estate, situate in
Hoboken, in this state. The complainant Stevens is the holder
of a mortgage thereon, given by the complainant Bulat and
wife. They join as complainants in this bill for the purpose—
*first,* of establishing the title of Bulat to the land in question,
as against the defendants, and *second,* to perpetually restrain
an action of ejectment brought by defendants against Bulat in
the circuit court of the county of Hudson.

The complainants give as a reason for coming into this court
that although Bulat is in equity the actual owner of the prem-
ises in question, yet, owing to a legal defect in his title, it is
highly probable, if not certain, that he will be defeated at law.

Bulat *v.* Londrigan.

The grounds upon which he rests his title to relief in this court are—*first,* that the defect of title relied upon by defendants is purely technical and without the least merit, and *second,* that defendants are estopped in equity from setting it up at law.

A brief outline of the facts is as follows:

The defendant Eliza, at and before the 4th day of September, 1885, was the holder of both the legal and equitable title of the premises, subject to certain mortgages, assessments and arrears of taxes and water rents, and with her husband was, on that day, justly indebted, for money lent and advanced to her by one James Williams, in the sum of $300, besides interest; on that day Williams recovered a judgment in the Hoboken city district court, based upon that indebtedness, and actual service of process on both of the defendants, for the sum of $300 debt and $25.20 costs; execution against the goods and chattels of the defendants was duly issued thereon to the sheriff of Hudson county, who duly returned the same unsatisfied for want of goods and chattels whereof to make the same. On the 17th of September, 1885, Williams, through his attorney, James F. Minturn, caused the said judgment to be docketed in the Hudson county common pleas, and a *fieri facias de bonis et terris* to be issued thereon; the sheriff of Hudson county duly levied upon the premises in question, and caused the same to be duly advertised and sold, and the same were bid off and sold and conveyed to Williams for the sum of $200, which, under the circumstances, was a fair price for the property, and after deducting the sheriff's execution fees left a balance due on the judgment of over $200; Williams took immediate possession of the premises by means of an attornment to him by the tenants of the defendants in the actual occupation of the premises, made by the express direction and consent of defendant Patrick, and retained such possession until the year 1890, when he conveyed them by deed, with full covenants of seizin and warranty, to the complainant Bulat for the sum of $5,500, and Bulat took possession and afterwards destroyed or removed the erections previously on the premises, and erected thereon expensive and valuable buildings at a cost of over $17,000. In the meantime two mortgages, amounting, besides interest, to $3,200, and a considerable arrearage of taxes and

assessments, which were liens on the property at the date of the sheriff's sale, were paid off, either by Williams or Bulat, and also large assessments for sewers, &c., which were laid on the property either about the time of the sheriff's sale or between that time and the time that Bulat purchased from Williams, were also paid, and a mortgage upon this and other property of Bulat for $13,000 was given by Bulat and his wife to Stevens for money loaned, which was used by Bulat, with other moneys, in the erection of buildings on the premises. In 1893 the defendants desired to secure money by mortgaging other real estate owned by them in Hoboken, and, finding this Williams judgment an obstruction, Mrs. Londrigan, personally, called upon Williams and obtained from him a satisfaction of the said judgment without paying any money therefor. Williams died before the action of ejectment was brought.

The defendants both lived all the time in the city of Hoboken, near the premises, and were fully cognizant of all these facts, acquiesced in them, and never made any objection to the possession and occupation by Williams and Bulat in succession of these premises, and set up no claim or title to them until the year 1899, when they commenced the action of ejectment.

The particular defect in the legal title of the complainant is an actual or supposed defect in the affidavit which was made and filed with the transcript from the district court to the common pleas, in order to perfect the docketing of the judgment.

The affidavit which was so filed was made and verified by James F. Minturn, attorney of Mr. Williams, and it was in conformity with what was at that time believed by the bar of the state to be the requisites of an act of March 27th, 1882. *P. L. of 1882 p. 195; Gen. Stat. p. 1260 §§ 4, 5.* That act was generally understood by the bar as dispensing with the provisions of the seventy-seventh section of the original act creating district courts. *P. L. of 1877 p. 257; Gen. Stat. p. 1228.*

After the decision of the case of *Grimshaw* v. *Carroll, 33 Vr. 730,* a young lawyer ascertained this defect in the title and communicated it to the defendants, whereupon they brought their action of ejectment.

The complainants pray relief, and ask, first, that the title of

Bulat may be established as complete in the premises, or, failing in that, that the defendants may be put upon terms of repaying to the complainant Bulat all the moneys paid out for encumbrances in the shape of mortgages and other liens due upon the premises at the time of the sheriff's sale, and for all assessments for benefits due to municipal improvements that accrued since, and for all the buildings which he has erected on the premises.

Let us inquire what the precise defect in the affidavit was. It reads as follows:

"James F. Minturn, being duly sworn, says that he is attorney for the plaintiff in within entitled cause; that the said judgment is a *bona fide* and existing judgment against the said defendants for money loaned by plaintiff to defendants, and that the whole amount of said judgment and costs still remains due and unpaid."

Looking at the opinion in *Grimshaw* v. *Carroll*, I find that the sole defect was that the affidavit does not state that the debtor was not possessed of goods and chattels sufficient to satisfy the amount due. The affidavit does not state in so many words that more than $10 was due, but it does state what is tantamount to that in stating that the whole amount is due.

With regard to the lack of personalty, the execution against goods was issued out of the district court and properly returned, although that is dispensed with by the act of 1882. The return to the district court of that execution unsatisfied for want of goods and chattels, and the levying of the execution out of the pleas on the real estate, without resort to chattels, is *prima facie* proof that the defendants had no personal chattels upon which to levy, and there is not a particle of evidence in the case upon which a contention can be based, nor, in fact, was any contention made on the part of the defendants that they were possessed at that time of goods and chattels sufficient to satisfy the judgment or any part of it.

This shows that there was no intentional evasion of the statute.

But grant, for argument's sake, that there was evidence from which it might be inferred that the defendants were possessed of personalty sufficient to pay the whole or a part of this judgment, the question for consideration in this court still remains, what real injury have they suffered under the circumstances?

Bulat *v.* Londrigan.

The provision in our statute that lands are to be sold for the payment of judgment debts only after the exhaustion of the personality is a relic of the rule of the ancient English common law, having its origin in the feudal system, that land could not at all be sold for the payment of debts. We all know how gradually the great English landholders yielded to the importunity of mercantile creditors that their land should be devoted to the payment of their debts. Such liability was, however, finally established by statute, coupled with the condition, however, which we find in our system, providing for the exhaustion of the personality prior to the sale of the land.

But the hardship of this provision, and I may add, its folly, was early manifested and remedied by the provision found in the revised act of 1846 (*Rev. p. 601 § 5*), giving the defendant the right to require the sheriff to sell his land before selling his chattels. It is common knowledge that it may, and probably will, work a greater hardship to a defendant to have his personal property, which generally includes the implements of his business, the possession of which is an actual necessity for the prosecution of his ordinary affairs, sold away from him on a short notice, than to have his real estate so disposed of. In the first half of the last century, and even later, sheriffs were in the habit, at their own risk, of leaving chattels levied upon in the possession and use of the defendant for weeks and months. But now that is all changed. Sheriffs take no responsibility in such cases; with the result that a levy upon personalty is usually accompanied by an immediate change of possession and control.

Besides, it is in the power of any execution debtor to apply his personalty to the satisfaction of a debt, if he so chooses. So that it may be safely affirmed that there can be no presumption that any actual injury is inflicted on an execution debtor by subjecting his real estate to the payment of his debt before exhausting his personalty.

In the case in hand, as I have said, no proof was offered that the defendant had a sufficiency of personal property to pay the debt or any part of it, and no point based on the supposed possession of such a sufficiency of personalty was made either in the

answer or at the argument. I am therefore justified in holding that the defendant suffered no such injury from the neglect, if any, on the part of the sheriff to do his duty in that respect, either when the execution out of the district court came to his hands, or afterwards, when that out of the common pleas came to his hands, as would arrest the attention of a court of equity.

The case is also devoid of one element which always influences a court of equity in applying the principles of equitable estoppel. It is not a case where the question is which of two innocent parties must suffer by the conduct of a third. There has here been no loss or injury to the defendants.

I conclude, then, that the defect here relied on is purely technical, entirely harmless and devoid of merit.

Under these circumstances the complainants contend that the defendants are estopped by their conduct, as well positive as negative, from asserting their legal title.

In order to appreciate the full force of the facts relied upon to create an estoppel, it is proper to give them more in detail.

Londrigan is an old resident of Hoboken, and a man of business experience, especially in real estate. He was a general contractor for street work, and held municipal offices both in the city and county.

In the period of inflated prices which followed the war of the rebellion he acquired several pieces of real estate in Hoboken, upon which he made improvements of more or less value, and placed heavy mortgages.

When the shrinkage in values, which occurred between 1875 and 1885, overtook him, he was embarrassed, and managed his affairs as best he might.

Foreclosures were had, as I understand the evidence, of all the mortgages on the several pieces of land.

In some instances he let the property go to the mortgagee, on condition that he should be relieved from personal liability on his bonds.

In other instances, including that here in question, he let the property be sold and procured the title so derived to be placed in his wife's name. So far as appears, she had no estate of her own, and paid nothing for the property here in question, the whole being represented by the mortgages.

Bulat *v.* Londrigan.

It appears affirmatively that in these affairs Londrigan was by nature and experience entirely able to take care of himself. He managed all the property as his wife's agent, with her consent and approbation. In fact he was the real owner.

The property in question consists of two adjoining city lots, twenty-five by one hundred feet each, situate on the corner of Adams and Fourth streets in the meadow district of Hoboken. It was, when Londrigan acquired it, according to his statement, a mere salt marsh, covered with water at high tide and after heavy rains. He erected on the corner lot a small dwelling and store, at a time when materials and labor were high in price, and later on he moved onto the lot adjoining the corner a wooden building resting on posts, which building had been erected by him on another lot and used at first as an engine house, but when placed on one of the lots here in question, was used first as a stable and afterwards as a factory.

At the time of the sheriff's sale these buildings—the house on the corner lot, and the stable on the adjoining lot—were much depreciated in value, both by reason of the depreciation in the market price of the materials and labor of which they were composed, and also by reason of their unsubstantial character. This was especially true of the wooden building. They were in the possession of a firm of manufacturers of brewers' materials, Messrs. Kitz & Grempler, at a rent of $500 a year, payable monthly, which was shown to be a high rent, only obtainable under unusual circumstances, and were subject to two mortgages, one of $2,200, and the other of $1,000, aggregating $3,200, with an indeterminate amount of arrears of interest, besides taxes and assessments, amounting to a considerable sum of money, and, in all, to nearly or quite $4,000.

Williams appears to have been a friend of Londrigan, and when, in 1884, the latter wished to go into the kindling-wood business in the name of his wife, Williams loaned him and her $400 in cash, upon the note of the defendant Eliza, endorsed by Patrick. This note was reduced, so Patrick swears, by small payments, to $300. No interest was demanded upon it, and it was the foundation of the judgment in question.

There is no allegation in the answer, nor the least foundation

in the evidence, to support the notion that any unfair use was made by Williams of his judgment and execution, or that any unfair advantage was taken of the defendants in the proceedings under it. Londrigan does, indeed, swear that about that time he was sick and secluded, for a period not mentioned by him, at Morris Plains. He does not state that it was at the hospital there, nor does he state the nature or duration of his illness; nor is there the least evidence given by anybody else on that subject. The sheriff, as we have seen, served process on both of the defendants, and Patrick was, as we shall see further on, in Hoboken at or shortly after the sale. The evidence of his absence is so indefinite and uncertain that counsel made no point of it in the argument.

The judgment was docketed September 19th, 1885; *fieri facias de bonis et terris* was issued October 6th, returnable the first Tuesday of November, 1885; the advertisement of sale was for the 11th of February then next, and the sale was then adjourned until the 18th, on which day it was sold to the plaintiff, as we have seen, he realizing out of his bid, after deducting the costs of sale, less than one-half the amount due him on his judgment.

Immediately after the sale, Williams, through his real estate agents, gave Kitz & Grempler notice to pay the rent to him. They declined to do so without authority from Londrigan, who had generally collected the rents and acted as the agent of his wife in the management of the property. Thereupon, as both Kitz and Grempler explicitly testify, Londrigan came to their office with Williams, and declared to them that Williams had purchased the property and that they should pay the rent to him as the owner.

This is denied by Londrigan, but I can give no credence to his denial in the face of the clear evidence of these gentlemen, who appear to be intelligent business men, and who have no reason or desire to prevaricate, and who testified with caution. In fact, I think Londrigan's denial of this interview, so thoroughly established and so probable in itself, must weigh against his reliability in other statements when he conflicts with other witnesses.

It further appears that Bulat had formerly lived and carried

on his business of a grocer, butcher and retail wine and beer merchant in the dwelling on the corner, in fact, was the first tenant thereof, and had talked of buying it from Londrigan, and that he had purchased the lot adjoining the wooden building, and was occupying it for the purposes of his business.

Mrs. Bulat swears that shortly after the sheriff's sale, Londrigan and Williams were together in Bulat's place, and that Londrigan then ·informed Bulat that Williams now owned the property in question, and that he (Bulat) could buy it of Williams. Mrs. Bulat also swears that at about the same time Mrs. Londrigan came to her place to make a purchase of groceries, and that they fell into conversation about the property in question, and that she (Mrs. Bulat) said that she was sorry Mrs. Londrigan had sold out to Williams, because she and her husband would like to buy the property, and that Mrs. Londrigan said that she could buy it of Williams. The date of this conversation is fixed by the witness (Mrs. Bulat) at about thirteen years before giving her testimony, which was in May, 1901, and that period was fixed in her mind by the fact that her husband was obliged by an ordinance of the city to abandon either his grocery and butcher business or his wine and beer business, and chose to give up the former business, and offered his groceries for sale at reduced prices, which attracted Mrs. Londrigan to the place.

These conversations are denied by both Mr. and Mrs. Londrigan, but Mrs. Bulat is supported by a Mr. Cereghino, an intelligent and apparently respectable Italian, who swears that he heard one of the conversations testified to by her.

I think the conversations, so verified, were quite natural and probable, and I give credit to Mrs. Bulat and Mr. Cereghino.

Here we have direct encouragement—slight, indeed, but still encouragement—by both the defendants to Bulat to purchase this property from Williams.

Then the evidence is full and complete, as before remarked, in fact, it is admitted in the answer, that both Mr. and Mrs. Londrigan knew that Bulat had purchased this property and taken possession of it, and they were cognizant of his making the expensive erections and improvements which he put upon it.

But the case does not stop there. I have said that Londrigan managed to have some of his property sold under foreclosure and bought in by the mortgagees or some other friend and held for his wife. The property here in question was bought in by a Mr. Huesman in 1877, under foreclosure of a mortgage for $1,500 given by a previous owner, besides interest and costs. In 1882 Huesman conveyed to the defendant Eliza for the consideration of $1,500. Londrigan and his wife at the same time gave a mortgage upon it to Steffen Deickman for $2,200, probably to secure money to pay Huesman, who, doubtless, was a mere mortgagee.

In 1884 the defendants gave a second mortgage on the premises for $1,000 to one Posthof, a German. This mortgage was being pressed at the time of the sheriff's sale, and Williams was obliged to pay, and did pay, July 26th, 1886, five months after he purchased, to Mr. S. A. Besson, who was foreclosing the mortgage as solicitor for Posthof, the sum of $1,252.14, to satisfy the principal, interest and costs. The amount indicates that no interest had ever been paid upon it, and amounted on that day to about $150, and the costs must have been about $100 more.

Now, it appears by the evidence of the defendants that Posthof at that time held the title as mortgagee to certain property of considerable value then and still in the possession of the defendants. How long he did so hold it does not appear, but it does appear that he was anxious to realize his money and return to Germany; and three years afterwards, in February, 1889, he conveyed this last-mentioned property to Mrs. Londrigan. I infer from the evidence that the defendants at that time gave back a consideration mortgage, which was assigned to and held by the New Jersey Title Guaranty and Trust Company. The gentleman who acted for that company testified that the mortgage held by it in 1893 was a consideration money mortgage.

Now, four years later—in 1893—the property so conveyed by Posthof to Mrs. Londrigan was advertised for sale by the sheriff under a judgment against the defendants, in favor of one Slogan, whereupon the late Mr. John C. Besson, who acted as the defendants' counsel, applied to the trust company for an

additional loan. Its searcher, in preparing for that loan, found this Williams judgment unsatisfied. Williams was still alive, and Mr. J. C. Besson prepared a satisfaction piece of his judgment, reciting its recovery and payment, and sent Mrs. Londrigan to Williams to procure it to be executed by him, which Williams did, without the present payment to him of any money.

Now, there is no room for contention, and there is no contention, that any money had been paid to Mr. Williams by either of the defendants, or by anybody on behalf of either of them, to satisfy the balance of over $200 due upon his judgment, and the case shows no possible ground upon which Mrs. Londrigan could ask Williams to satisfy that judgment except that he had received satisfaction of it in the conveyance to him by the sheriff of the premises here in question. Looked at in that light, it seems to me that the transaction was an affirmance by the defendants of that sale. It was tantamount to saying to Williams, "You received payment of your judgment by the sheriff's sale of the two lots in question, and you ought to satisfy it."

It was suggested that Williams had obtained satisfaction by the receipt of the rents of the property. But the application for the satisfaction piece was not put upon that ground, and no such thought was in the minds of either party. Both of the defendants swear that they each supposed that the property had been sold away from them forever.

But the case does not stop just there. Mrs. Londrigan was pressed to tell how she induced Williams to sign this satisfaction piece. I give some extracts from her evidence on that topic:

"*Q.* And you recollect this judgment was in the way of getting that money from the title company?

"*A.* I didn't understand what was in the way; I understood nothing only this: I understood, when I had occasion to go, that they were going to sell out the place without my knowledge; then I got a note to that effect, and I went down to Mr. [J. C.] Besson to show it to Mr. Besson; Mr. Besson told me I should have that note [judgment] canceled and regulated, and to get Mr. Williams' signature to it; that is all I knew, and I went out to do it.

"*Q.* (By the Court.) Did you get Williams to sign that satisfaction piece?

"*A.* Yes, sir.

"*Q.* How did you manage to get him to sign it?

"*A. It was agreed to in the suit;* he was in the house.

"*Q.* Didn't you think that was very generous in Mr. Williams to sign away a judgment he held against you?

"*A. It was paid,* and he forgot to cancel it in the hall in the county; he didn't cancel it.

"*Q.* That was this very judgment under which the property here in question was sold away?

"*A.* It was paid for, and he didn't cancel it; then I got it canceled.

"*Q.* How was it paid for?

"*A.* I couldn't tell you that.

"*Q.* It was paid for by this sale, wasn't it?

"*A.* I don't know; I couldn't tell you.

"*Q.* How do you know it was paid for?

"*A.* Because Mr. Besson told me; *Mr. Besson told me that was paid for, and should have been canceled, when it wasn't canceled;* he had no time to go, and I had time, and he wrote out what was necessary.

"*Q.* Which Mr. Besson told you that?

"*A.* Mr. John Besson.

"*Q.* Was he your lawyer?

"*A.* He was in little cases with regard to that; Mr. Besson sent me to the trust company.

"*Q.* You never paid Mr. Williams any money yourself?

"*A.* No, sir.

"*Q.* You never knew of your husband paying him any money?

"*A.* I knew nothing concerning such matters.

"*Q.* You went there and asked him to cancel it because it was paid?

"*A.* I did; I showed Mr. Besson the letter.

"*Q.* You asked Mr. Williams to cancel that judgment because it was paid, is that it?

"*A.* I didn't say anything about judgment, because I didn't know what it was; I told you what it was; I said, 'Will you please sign this? Mr. Besson sent me over to have it signed.' "

Now, the fact that Mr. John C. Besson told her that the judgment was paid, and sent her with confidence to procure the execution of the satisfaction piece, is significant, and equally significant are the words, "*it was agreed to in the suit,*" which also refer to the payment of the judgment. There was but one suit to which that remark could apply, and that was the suit resulting in the judgment here in question.

Now, taking that language in connection with Mr. Besson's confidence that Mr. Williams would execute the satisfaction piece, and his assertion that the judgment was paid, and the fact that Williams, in order to bring his cause within the jurisdiction of the district court, made no claim for a year's interest on the principal; that after purchasing the property at less

Bulat v. Londrigan.

than the amount of the judgment, he made no further attempt to collect the balance due, and when he was asked to satisfy it did so without any hesitation, the suspicion, if not the belief, becomes most natural that at the time the judgment was recovered it was agreed between the parties that Williams should take the property here in question for the payment of his debt. Posthof was pressing for his $1,000 mortgage, and may have been uneasy about his money claim upon the other property. Besides, at that time there were arrears of assessments upon the property, and the imposition of new assessments for sewers and paving was imminent. So that, taking all the facts and circumstances, it is easy to see that it was an arrangement quite beneficial to the defendants to induce Williams to take the property in question off their hands at the amount of his debt, and at once pay and satisfy Posthof's mortgage upon it. Hence their promptness in putting him in possession.

There is another circumstance here proven in the case that is not without significance. Some short time—just how long does not appear—before the sheriff's sale, Mrs. Londrigan called on Mr. Kitz and asked him to make her a payment in advance of one year's rent ($500) of the premises. Mr. Kitz declined. The evidence to this effect given by Mr. Kitz was not denied by Mrs. Londrigan, and no explanation was given of it. If this was done at or after the time the judgment was recovered, as the indications are that it was, and Mrs. Londrigan had succeeded in her project, the result would have been to defraud somebody out of the whole or the greater part of that sum.

It is said that the procuration of the execution of the satisfaction piece by Williams occurred two or three years after Bulat purchased from Williams, and therefore could not have been relied upon by Bulat in his purchase, and consequently cannot be set up by him as an estoppel; that the estoppel, if any, arising out of the execution of that satisfaction piece works in favor of Williams and not of Bulat.

But the answer to that is that Williams' deed to Bulat contains a covenant of warranty, and Williams' right to set up the estoppel passed at once under that covenant to his grantee. For it is quite plain that as soon as the action of ejectment was

Bulat *v.* Londrigan.

brought and Williams, or his personal representative, was notified thereof, he could at once file his bill in this court against the Londrigans to enforce the estoppel by restraining them from ejecting the complainant, on the ground that it would render him liable in an action on the covenant of warranty. In order to avoid this circuity of action the right of the warrantor to sue is at once vested in the warrantee. In fact, the right to set up the estoppel, if any, arising out of the deliberate act of the defendants in putting Williams in possession, and their silence during his ownership, comes to the complainants in the same way, namely, by virtue of the covenant of warranty in Williams' deed, which subrogates them to all his equitable rights against the defendants.

Upon these facts, then, the questions are—*first,* have complainants any remedy? and, if so, *second,* what remedy and upon what terms, if any?

It does seem to me that the first question can have but one answer. The case is one that appeals to the sense of justice of a chancellor, for the defendants propose to take from complainants and appropriate to their own use, not by way of making up to themselves any loss, for, as we have seen, they have sustained none, and without making any compensation therefor, property which has cost the complainants at least $23,000. It seems to me that it does not require the educated conscience of a chancellor to perceive the inequity of such a result. It strikes with force the dullest and most untutored moral sense.

Let us look at the arguments of the defendants. They say to Williams and to complainant: "Your lawyer made a mistake while in your employ in prosecuting your business, and, hence, it is your own mistake. You acted at your peril. You were bound to know the law and that the affidavit relied upon was defective and your proceedings taken *in invitum* were deficient, and you must take the consequences of your own stupidity. You ought not to have paid off and canceled the mortgages upon the property nor paid the arrears of taxes and assessments without being quite sure your title was good, and now that your title proves not to be good we are to have the benefit of those payments. You ought not to have expended your money in building

upon the property, and, now that you have done so, we must have the benefit of it."

The answer to that argument on the part of Williams and the complainant is: (1) that everything was done in perfectly good faith; that there was no intentional evasion of the command of the statute, and that it was supposed and believed by competent counsel that the law had been in all respects complied with, and acting on that belief complainant proceeded in good faith to spend his money; (2) that the omission was perfectly harmless and defendants suffered no injury whatever from it; the result to the defendants would have been the same if the statute had been fully complied with; it is, in short, quite similar to the lack of a seal on a writ, or a deed, or other like omission; (3) that you fully recognized at the time the validity of the proceeding, and the title obtained under it; that you put us in possession and thereby ratified the proceedings, and waived all such irregularities as work you no injury; you stood by without protest or claim, and saw us spending our money in expensive improvements on the property.

To this the defendants answer: "We did not know of the defect, and without knowledge there is no estoppel."

To this the complainants reply: "You are chargeable, under the circumstances, with such knowledge; you knew Williams was about to sell your property under legal proceedings; you knew those proceedings were matters of record, and that that record was open to your inspection, and it was your duty, if you ever expected to dispute the validity of those proceedings, to examine that record and satisfy yourselves whether or not the proceedings were in accordance with law. If you failed to make such examination and stood by without protest while innocent third parties were palpably acting on the supposition that the proceedings were valid, you are estopped from afterwards setting up a harmless defect which might then have been discovered by proper inquiry. If you had refrained from assisting Williams to obtain possession he would have been put to his action, and the validity of his title would have been brought to an immediate test before any irretrievable step had been taken by him or his grantee."

To this, again, the defendants answer: "If we had examined

the record and taken advice of counsel upon it we should have been advised precisely as you were advised, that the proceedings were valid; and hence our failure to assert the contrary was based upon ignorance of our rights; and, hence, ignorance of our rights is not in such a case that sort of ignorance of the law which ought to estop us."

The answer of the complainants to that is that the ignorance of the law was common to both parties, and neither one can be thereby injuriously affected, one way or the other; that it cannot help the defendants to any greater extent than it also helps the complainants.

But the complainants go further and assert and argue that over and above the putting of Williams in possession, the procuration of the execution of the satisfaction piece was an affirmance of the sale, because it was in effect saying to Williams, "We conveyed you this property through the instrumentality of a sheriff's deed, and although the price named in the sheriff's deed was not sufficient to pay your debt, yet by reason of an arrangement between us at the time it did pay your debt and you ought to satisfy the judgment."

I am of the opinion that the complainants' position is sound, their arguments unanswerable and that they are entitled to relief.

The effect of mere silence in creating an estoppel has been considered in this court in several cases. I refer to *Sumner* v. *Seaton, 2 Dick. Ch. Rep. 103,* and *Ruckelshaus* v. *Oehme, 3 Dick. Ch. Rep. 435,* and, in the latter case, on appeal, *Borcherling* v. *Ruckelshaus, 4 Dick. Ch. Rep. 340.*

In *Sumner* v. *Seaton* numerous authorities are cited and distinguished, and particular attention is called to an element there existing, and which is also found here, namely, that the defendants knew that the complainants were expending their money on the premises in question in the full belief that they were the owners of the fee therein, and that the defendants had the same opportunity to know the truth in that behalf as the complainants had.

In *Ruckelshaus* v. *Oehme* Mrs. Oehme succeeded to the title to the premises in question as the heir-at-law of her sister, Mrs.

McCulloch, such title, however, being subject to the life estate
of the surviving husband of Mrs. McCulloch as tenant by the
curtesy.    After the death of her sister, Mrs. Oehme conveyed to
McCulloch, and three years afterward McCulloch died intestate,
leaving numerous heirs-at-law, all collaterals and non-residents
of New Jersey.    Some time after McCulloch's death and the
right of Mrs. Oehme, but for the conveyance which she had made
to McCulloch, had become perfected, she conceived the idea of
repudiating that conveyance on the ground that it was procured
by fraud or other contrivance, and brought an action of eject-
ment against Ruckelshaus, who had been all the while a tenant
of the premises, and after the death of McCulloch had paid the
rent to his heirs, through an agent, and laid the accrual of her
title at the death of McCulloch.    She succeeded in that action,
and afterward an action for the mesne profits was brought, and
it was held, at law, that Ruckelshaus was bound to repay to Mrs.
Oehme the amount of the rent which had accrued between the
death of McCulloch and the time of the bringing of the action
of ejectment; and Ruckelshaus filed his bill to be relieved against
the payment of that part of the rent, and he was relieved in this
court, and that relief was affirmed in the court of errors and
appeals.

In that case Mrs. Oehme knew all the while that Ruckelshaus
was paying the rent to the heirs of McCulloch upon the supposi-
tion that they were the real owners of the premises.

A defect of the technical character of that here in question
was dealt with by the supreme court of the United States in
the case of *Kirk* v. *Hamilton, 102 U. S. 68.*    There a suit had
been brought by a judgment creditor to set aside a conveyance
of real estate made in fraud of creditors, and a decree had passed
for the complainants and provision made for the sale of land
sufficient to pay the debts, and a trustee appointed for that pur-
pose.    By the practice prevailing in the District of Columbia,
where the suit arose, the receiver could only sell so much land
as was necessary to pay the debts, and for that purpose required
a special order of the court.    After such an order had been
made and certain lands sold and applied for that purpose, other
creditors came in and proved their debts, which required a sale

of more land; and the receiver, without procuring that order, proceeded to sell other lands to satisfy those new debts. The owner of the lands appeared before the trustee and disputed the debts for which the sale was made, but made no other objection. After the purchaser under this last sale had entered and made improvements the owner brought ejectment.

The court, in disposing of the case, assumed that the want of an order of sale was a fatal defect, and proceeded to inquire whether the defect was not waived by the silence of Kirk, the creditor, while the purchasers from the receiver made valuable improvements on the premises, and whether his appearing to contest the validity of the claims in the last batch of creditors did not create an estoppel. On that subject the learned judge expressed himself as follows (at *p. 75*) :

"After the confirmation of the sale of April 19th, 1864, before any deed had been made, and while the cause was upon reference for a statement, as well of the trustee's accounts as for distribution of the fund realized by the sales, Kirk, it seems, appeared before the auditor, by an attorney, and made objection to the allowance of the simple contract debts which had been proven against him in his absence. So far as the record discloses, no other objection to the proceedings was interposed by him. Undoubtedly he then knew, he must be conclusively presumed to have known, after he appeared before the auditor, all that had taken place in that suit during his absence from the district, including the sale of the premises in dispute, which took place only a few months prior to his appearance before the auditor. If that sale was a nullity, the court, upon application by Kirk, after his appearance before the auditor, could have disregarded all that had been done subsequently to the first sale, discharged Hamilton's bond, returned the money he had paid, and, in addition, placed Kirk in the actual possession of the property. No such application was made. No such claim was asserted. No effort was made by him to prevent the execution of a deed to the purchaser at the second sale. So far as the record shows, he seemed to have acquiesced in what had been done in his absence. In 1868, three years after his return to the city, and two years after Hamilton had secured a deed in

pursuance of his purchase, he became aware that Hamilton was in actual possession of the premises, claiming and improving them as his property. He personally knew of Hamilton's expenditures of money in their improvement, and remained silent as to any claim of his own.  *  *  *  Hamilton was in possession under an apparent title acquired, as we must assume from the record, in entire good faith, by what he supposed to be a valid judicial sale, under the sanction of a court of general jurisdiction."

Under those circumstances the court held that the only question was whether the estoppel was such as could be set up in an action at law in an action of ejectment; and they held it could be. The facts of that case so far resemble those of this as to make the reasoning applicable here.

Another important case is that of *Diamond* v. *Manheim, 63 N. W. Rep. 495.* In that case the plaintiff, being the undoubted owner of the land in question and indebted to a creditor, executed to his creditor a promissory note and a mortgage on the land to secure it, which instrument contained a power of sale. The mortgagee assigned that mortgage to another party who, at the proper time, exercised the power of sale and purchased the property at his own sale. There was a fatal defect in the record which was the basis of his proceeding, consisting in the failure of the clerk to properly index the assignment of the mortgage. This defect was visible to any person who would examine the record. The purchaser under the power paid the taxes on the land, which was vacant and unoccupied for several years, and then conveyed the premises to the defendant who took actual possession and made improvements. The plaintiff stood by, knowing that his mortgagee and assignee and purchaser were paying the taxes, and made no objection. The only affirmative act he did was to hand over to the last purchaser an old-paid mortgage which he had given prior to the one under which title was derived. Subsequently, discovering the error in the record, he brought his action of ejectment, and it was held that he was estopped. In so holding, the court, after a thorough review of the authorities, held distinctly that although he may not have known of the defect during all those years, yet he was chargeable

with such knowledge, and that his ignorance of the fact of the defect was no excuse. The gist of the case was that the defect was such as either party might have discovered by examining the record, and that the plaintiff during all the time of his silence knew that the holders of the defective title were paying the taxes and afterwards were improving the property in the full belief that their title was perfectly good. That case also much resembles this.

Of the same character is the case of *Conklin* v. *Wehrman, 38 Fed. Rep. 874.* There the title had two defects: (1) it was based on a writ of attachment which was void for want of a seal; (2) a judgment rendered thereon was in form *in personam,* and therefore void because the court had no jurisdiction of the person of the defendant, the original notice having been served without the territorial jurisdiction of the court. The bill was filed to enjoin an action of ejectment and the gravamen of the bill was laches on the part of the defendant in standing by while the purchasers under the holders of the defective title paid the taxes and made improvements, and it was held, on demurrer, that the bill was good.

The effect of ignorance of the law, as applied to known facts, is shown by the leading case of *Storrs* v. *Baker, 6 Johns. Ch. 160,* and see *2 Pom. Eq. Jur.* §§ *843, 850.*

The only other one of the numerous authorities cited by counsel to which I deem it worth while to particularly refer is *Freiknecht* v. *Meyer, 11 Stew. Eq. 315,* and, on appeal, *12 Stew. Eq. 551.* There the holder of two mortgages upon land recovered a judgment in a justice's court based upon an outside debt against the mortgagor who still owned the equity of redemption. The judgment was imperfectly docketed in the common pleas, and *fieri facias de bonis et terris* issued and levied upon the mortgaged premises, which were sold thereunder and purchased by the mortgagor. The proceeding was, in effect, a cheap mode of foreclosure. Both parties supposed that the judgment was legally docketed, and that the title obtained thereunder was valid. The owner of the equity acquiesced in the sheriff's sale, and yielded possession to the mortgagee, who entered and occupied the premises for about five years, and in the latter part of

Bulat *v.* Londrigan.

his occupancy made valuable improvements. Soon after these improvements were made the mortgagor and original owner of the equity discovered the defect in the docketing of the judgment, and filed his bill to redeem the premises from the mortgagee. The court of errors and appeals held that it could only be done upon terms of making compensation to the mortgagee for the improvements put upon the property while he was in possession, and both supposed that his title was perfect. The discussion of the learned judge who spoke for the court of errors and appeals (at *p. 557 et seq.*) is full and complete.

The equitable principles governing that case apply here, and I am unable to perceive that they lose any of their force when presented in behalf of a complainant. The great object and purpose of this court is to do justice between the parties. The equity granted the defendant in the case just cited was an equity with intrinsic merit, such as to give the party a standing in this court as a complainant and a right to relief. See *1 Pom. Eq. Jur.* § *390*.

The only question is as to the character and extent of the remedy to which complainants are entitled. Shall they be put upon terms of being content with the reimbursement of all money paid for encumbrances, including taxes and assessments, and also additions and repairs, after deducting all rents and other income?

In determining this question, we must consider—*first,* whether or not the evidence justifies the belief that the defendants really lost anything by the sale. Did they suffer any involuntary sacrifice? If so, then the court would be disposed to confine the complainants to the remedy just mentioned, provided, *second,* it is still practicable.

I have assumed, without going into the detail of the evidence, that the property brought a fair value. Much evidence was given on that subject, with some contrariety of opinion, the result of which, to my mind, is clear in showing that $4,500 was a full price for the property; and the encumbrances which the complainants were able to prove, without including any arrears of interest on the Deickman mortgage, amount to almost $4,000, which, with the Williams judgment and sheriff's execution fees,

Bulat *v.* Londrigan.

would bring the price up to nearly $4,500. There is no proof that there was any complaint made at the time that the property did not bring a competent and satisfactory price, and then there is reason to believe that the payment of the Posthof mortgage by Williams enabled the defendants to induce Posthof to hold the other property mentioned until they were able to raise money to pay him the amount for which he held the other property in pledge; and, in addition, we have the facts before adverted to tending to show that there was probably an arrangement between Williams and the defendants by which he was to accept this property in payment of his debt.

Upon the whole I am unable to find that the defendants suffered any actual loss.

Then I think that the remedy, by way of reimbursement for outlays, is quite impracticable at this date, so far as relates to the time covered by Williams' occupation and ownership, owing to the lapse of time and his death. Much evidence was given on that subject, but it is manifest that it was incomplete.

The farthest the court could go in the way of imposing such terms would be to confine the account to the time of Bulat's ownership and credit him at the start with the whole of his payment to Williams. Such terms would probably be more acceptable to the complainants than to the defendants. But, upon consideration of the whole case, I am unwilling to impose any terms upon the complainants and think that the title of Bulat should be confirmed by a proper decree and by a perpetual injunction.

The complainants are entitled to costs.